CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
DEC 13 2021
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| GLENDA G.,[1] | ) |
|     Plaintiff, | ) |
| | ) Civil Action No. 4:20-cv-00036 |
| v. | ) |
| | ) REPORT & RECOMMENDATION |
| KILOLO KIJAKAZI, | ) |
| Commissioner of Social Security | ) By:   Joel C. Hoppe |
|     Defendant.[2] | )         United States Magistrate Judge |

Plaintiff Glenda G. asks this Court to review the Commissioner of Social Security's final decision denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I cannot find that the Commissioner's final decision is supported by substantial evidence. Accordingly, I respectfully recommend that the decision be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Commissioner Kijakazi is hereby substituted for the Commissioner of Social Security Administration as the defendant in this action. *See Bethea v. Astrue*, 455 F. App'x 145, 146 (3d Cir. 2011); 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

This is Glenda's second application for benefits. Glenda initially applied for disability insurance benefits ("DIB") and SSI under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f, in October 2013. *See* Administrative Record ("R.") 90, ECF No. 12. Among other things, she alleged that "significant back and hip pain ha[d] prevented her from working" since March 1, 2011 and that, although she had lumbar surgery in 2014, she "continue[d] to have lumbar pain" during the period relevant to those claims. R. 94. On June 28, 2016, ALJ Brian Kilbane issued an unfavorable decision after a hearing at which Glenda appeared with counsel and testified. R. 87–98. ALJ Kilbane identified severe impairments of degenerative disc disease and essential hypertension, R. 92; found that those impairments did not meet or equal the relevant Listing, R. 93 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04); and then evaluated Glenda's residual functional capacity ("RFC") and concluded that she could perform light work[4] with additional limitations, R. 93–96. She could occasionally climb ramps,

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

3

stairs, ladders, ropes, and scaffolds; she could occasionally stoop, kneel, crouch, and crawl; and she should avoid concentrated exposure to vibration and workplace hazards (such as unprotected heights and moving machinery). R. 93. Based on this RFC finding and the vocational expert's ("VE") hearing testimony, ALJ Kilbane concluded that Glenda could not return to her past relevant work as a certified nurse's assistant ("CNA"). R. 96–97. Nonetheless, ALJ Kilbane found at step five that Glenda could perform the requirements of certain light, unskilled occupations (hand presser, night cleaner, convenience store worker) that offered a significant number of jobs in the national economy. R. 97–98. ALJ Kilbane therefore found Glenda "not disabled" from March 1, 2011, through the date of his decision and denied her applications for benefits. R. 98.

Glenda appealed ALJ Kilbane's decision to this Court, *see* R. 104–11, but she voluntarily dismissed her complaint before the Court rendered a decision, *see* R. 138. Simultaneously, Glenda filed a new SSI application in June 2017, *see* R. 15, 187–92, alleging disability because of back problems, high blood pressure, hip problems, stroke, kidney disease, borderline diabetes, chronic obstructive pulmonary disease ("COPD"), and stomach problems, R. 115. She alleged that she became disabled on June 29, 2016—one day after the date of ALJ Kilbane's decision. *Id.* Glenda was forty-five years old, or a "younger" person under the regulations, on her alleged onset date. R. 114; 20 C.F.R. § 416.963(c). DDS denied her claim initially in September 2017, R. 113–23, and upon reconsideration in January 2018, R. 124–37.

On May 9, 2019, ALJ Theodore Kennedy issued an unfavorable decision after a hearing at which Glenda appeared with counsel and testified. R. 12–27; *see* R. 67–86 (hearing transcript) (Apr. 18, 2019). First, ALJ Kennedy found that Glenda had not engaged in substantial gainful activity since June 20, 2017, her application date. R. 18. At step two, ALJ Kennedy found that

4

Glenda had severe impairments of stroke, hypertension, and COPD. *Id.* At step three, ALJ Kennedy concluded that none of Glenda's severe impairments, considered both alone and in combination, met or equaled any relevant Listing. R. 20 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 3.02, 11.04; SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002)). He then evaluated Glenda's RFC and determined that she could perform "light" work with additional limitations. R. 20–25. She could lift and carry less than ten pounds frequently and twenty pounds occasionally; she could "constantly" push and pull up to those weights; she could stand and walk for about six hours and sit for about six hours in an eight-hour workday; she could "occasionally" climb stairs/ramps, balance, stoop, kneel, crouch, and crawl; she could never climb ladders, ropes, or scaffolds; she could never have exposure to unprotected heights; and she could occasionally have exposure to moving mechanical parts or pulmonary irritants. R. 20; *see* R. 23 (citing R. 119, 133–34).

Based on this RFC finding and the VE's hearing testimony, ALJ Kennedy concluded that Glenda could not return to her past relevant work as a CNA. R. 25. Nonetheless, ALJ Kennedy found at step five that Glenda could perform the requirements of certain light, unskilled occupations (price marker, stock checker, ticket seller) that offered a significant number of jobs in the national economy. R. 26; *see* R. 83–84. ALJ Kennedy therefore found Glenda "not disabled" from June 20, 2017, the date her application was filed, through the date of his decision and denied her application for benefits. R. 26. The Appeals Council denied Glenda's request for review, thereby making ALJ Kennedy's May 2019 written decision "the final decision of the Commissioner" denying Glenda's SSI claim. R. 1–3. This appeal followed.

III. Discussion

Glenda argues that ALJ Kennedy's decision is not supported by substantial evidence because ALJ Kennedy (1) failed to follow Acquiescence Ruling ("AR") 00-1(4) by not considering ALJ Kilbane's prior finding that Glenda had another "severe" medically determinable impairment and weighing that finding using the factors and circumstances outlined in AR 00-14, and (2) failed to properly evaluate the medical opinions and prior administrative findings in the record as required under the regulations. Pl.'s Br. 9–16, ECF No. 18. Both of Glenda's arguments are persuasive. Because her first argument alone requires remand, I address her second argument only briefly.[5]

---

[5] Glenda filed her application for SSI in June 2017. R. 15, 187–92. Therefore, recently revised regulations that apply to claims filed on or after March 27, 2017 apply here. *See generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). Among other things, these new regulations revise the procedure by which an ALJ must consider and explain his evaluation of medical opinions and prior administrative findings. *See* 20 C.F.R. § 416.920c. Under the new regulations, the ALJ must adequately explain whether and to what extent the medical opinions and prior administrative medical findings of record are "persuasive." *See id.* § 416.920c(b) ("We will articulate in our determination or decision how persuasive we find all of the medical opinions and all of the prior administrative findings in your case record."). In doing so, the ALJ must determine and explain whether each medical opinion and prior administrative finding is supported by and consistent with the record. *See id.* § 416.920c(b)(2), (c)(1)(2). The ALJ may, but generally is not required to, explain how he or she considered other factors, including a medical source's specialization and relationship with the claimant. *Id.* § 416.920c(c)(3)–(5). If, however, the ALJ determines that two or more medical opinions or prior administrative findings are equally supported by and consistent with the record "but are not exactly the same," he must "articulate how [he] considered" the "other most persuasive factors in paragraphs (c)(3) through (c)(5)." *Id.* § 416.920c(b)(3); *see also id.* § 416.920c(c)(3)–(5) (listing the provider's relationship with the claimant, the provider's specialization, and "[o]ther factors," including "evidence showing [that] a medical source has familiarity with the other evidence in the claim or an understanding of [the Social Security Administration's] disability program's policies and evidentiary requirements" as the other most persuasive factors to consider).

Here, Glenda argues that ALJ Kennedy's evaluation of the available medical opinions and relevant prior administrative findings failed to comply with these regulations. Pl.'s Br. 13–16. I agree. After summarizing each of the medical opinions and prior administrative findings, ALJ Kennedy wrote: "The undersigned has considered the persuasiveness of [the] prior Administrative Law Judge's decision and the aforementioned [DDS medical] opinions as generally consistent with each other and the medical evidence of record as a whole given their analysis of clinical findings, examinations, and the claimant's reported activities of daily living . . . , which support a light exertional level." R. 23. This cursory assessment does not satisfy the ALJ's obligation to explain his evaluation of each of the medical opinions and prior administrative findings in the record. It does not "articulate . . . how persuasive," 20 C.F.R. § 416.920c(b), ALJ Kennedy found each of the opinions, and it does not adequately explain whether each opinion is supported by and consistent with the record. To the extent it comments on consistency and supportability, this sentence appears to simply say that all the opinions of record are equally consistent

A.     *Summary*

   1.     *Relevant Medical Evidence*

Glenda has several medical conditions, including hypertension, R. 558, 577; hyperlipidemia, R. 436, 548; COPD, R. 376–79, 436; leg and foot swelling, R. 349–52, 386, 433; obesity, R. 548; insomnia, R. 367, 380; stroke, R. 303–05, 353–55; left-sided weakness, R. 303, 553–58; lumbar degenerative disc disease, R. 356, 375; hip dysplasia, R. 380; and lumbar osteoarthritis and spondylosis, R. 384, "[s]tatus-post lumbar laminectomy/disc prolapse for nerve impingement," R. 372, 379.

Because Glenda's first argument turns on ALJ Kennedy's failure to consider ALJ Kilbane's prior finding that she had a severe impairment of degenerative disc disease, I focus on those records relating to her back impairments. In July 2015, Glenda presented to Twana Rokhzay Jaff, M.D., at the Carilion Clinic, for foot and leg swelling. R. 386–90. Dr. Jaff noted that Glenda had a lumbar surgery in January 2014 and was "[s]table," "[s]tatus post lumbar laminectomy/disc prolapse for nerve impingement." R. 386–87. On exam, Dr. Jaff observed lower back and paraspinal muscle tenderness, normal musculoskeletal range of motion, and a normal gait. R. 389. She diagnosed lumbar osteoarthritis, lumbar spondylosis, disk prolapse, lumbar nerve root impingement, and status-post lumbar laminectomy. *Id.* She noted that Glenda had tried a short course of hydrocodone, and she directed Glenda to continue taking Flexeril. *Id.* She also recommended that Glenda follow up with a spine specialist and with pain management. *Id.* Dr. Jaff made similar findings at appointments in the summer of 2015. *See* R. 379, 384–85. She again told Glenda to keep taking Flexeril and follow up with a spine specialist, and she noted that Glenda "d[id] not follow up with pain management referrals." R. 379, 385. That October,

---

and equally supported by the record. If so, ALJ Kennedy was required to explain how he considered the other factors articulated in 20 C.F.R. § 416.920c(3)–(5).

Dr. Jaff made similar findings and diagnosed Glenda with degenerative disc disease. R. 372–76. In February 2017, Glenda returned to Dr. Jaff and reported back pain and numbness. R. 356–59. Dr. Jaff noted that Glenda had "[s]table" lumbar degenerative disc disease, observed normal range of motion and no tenderness, and wrote that Glenda had "refuse[d]" referrals to pain management and neurosurgery "in the past." R. 358–59. She directed Glenda to continue taking her medications as prescribed (including ibuprofen for pain and cyclobenzaprine for muscle spasms). R. 357, 359.

In January 2018, Glenda presented to Brandon Haubner, D.O., for a consultative examination. R. 490. She reported that she had experienced lower back pain for twenty years that "seem[ed] to be getting worse." *Id.* She explained that her pain was "constant" and "aching" and rated seven out of ten in severity. *Id.* It was worse in the morning and when walking down stairs, and it improved with movement. *Id.* Glenda told Dr. Haubner that a 2013 MRI showed herniated discs, and she explained that she had not tried physical therapy because she did not have insurance. *Id.* Glenda also reported that she had had left hip pain since 2012 that came and went and affected her "3–4 times a day." *Id.* On exam, Dr. Haubner observed largely normal findings, but he noted that Glenda had pain in her lower back during the lumbar and left hip range of motion testing he conducted. R. 492–94; *see also* R. 493 (finding that Glenda had the following thoracolumbar range of motion: "flexion 90 degrees, extension 30 degrees, lateral flexion 25 degrees bilaterally, rotation 30 [degrees]"). Dr. Haubner noted that Glenda reported that she had trouble walking up the stairs in her apartment, could perform light house work (although her son helped her), could shop for groceries, and used a shower chair for bathing. R. 490. Dr. Haubner diagnosed Glenda with lumbago and left hip pain, among other things. R. 494. He also opined that Glenda could stand/walk and sit for about six hours each in an eight-hour workday; lift and

8

carry twenty pounds occasionally and ten pounds frequently; "reach, handle, feel, grasp, and finger frequently without any manipulative limitations"; and "bend, stoop, crouch, and squat occasionally without limitation." *Id.* Glenda did not require an assistive device for ambulation, but Dr. Haubner recommended that she "avoid climbing stairs since [it] seem[ed] to bother her back." *Id.*

In January 2019, Glenda presented to Victor Owusu-Yaw, M.D., at Danville Neurology Associates. R. 591. She had had a stroke in November 2016, *see* R. 353, and Dr. Jaff recommended that she see a neurologist after a November 2018 MRI revealed abnormal findings, *see* R. 566–71, 591. Regarding Glenda's back, Dr. Owusu-Yaw noted that Glenda had a history of "back surgery and radiculopathy" and that she reported an "extruded disc with some residual heaviness . . . in [her] left leg." R. 592. He observed normal physical and neurologic examination findings, and he diagnosed lumbar radiculopathy, arthropathy, and neuralgia and neuritis, among other things. *See* R. 592–93.

    2.    *Glenda's Statements*

In August 2017, Glenda submitted a Function Report to DDS. *See* R. 225–32. She explained that her neighbor and son helped her with cooking, cleaning, laundry, and grocery shopping. R. 226–27. She required assistance getting in and out of the bathtub, she sometimes stayed awake all night because of pain, and she made simple meals (sandwiches, frozen dinners) weekly. R. 226–27. Glenda explained that she had difficulty cooking and doing housework because she could not stand for long periods and needed breaks. R. 227–28. She did not drive or go out alone because of left-sided weakness, "really bad" leg and foot swelling, and concerns about falling. R. 228. She only went out to go grocery shopping, attend doctors' appointments, and pay her bills, and she shopped for other essentials (phone cards, clothing) by phone or mail.

*Id.* During the day, Glenda read, watched television, did puzzles, and talked to friends and family over the phone. R. 229. She did not participate in social activities because being with others "stress[ed] [her] out." R. 230. Glenda explained that her allegedly disabling medical conditions impacted her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, hear, remember, complete tasks, concentrate, and get along with others. *Id.* She estimated that she could lift five to ten pounds and that she could walk for about five minutes before resting for ten to twenty minutes to catch her breath. *Id.* Her back hurt when bending and standing, and her stroke had affected her hearing, concentration, and ability to get along with others. *Id.* She could follow instructions and get along with authority figures, but she had difficulty handling stress and changes in routine. R. 231. Glenda used an unprescribed cane for walking every day. *Id.*

In December 2017, Glenda submitted another Function Report to DDS. *See* R. 251–58. She explained that she slept for only an hour or two at time because of back pain that kept her awake. R. 252. She also used a bath chair for bathing, needed reminders to take her medications, and made simple meals (sandwiches and frozen dinners) daily, which took about fifteen to twenty minutes. R. 252–53. She could make her bed and do light housework while sitting down (such as dusting), but even these chores took her thirty minutes to an hour "with breaks." R. 253. She could not do yard work, did not drive because she did not have car insurance, and only went out to shop for essentials and go to doctors' appointments. R. 254. Shopping took her about two and a half hours. *Id.* During the day, Glenda read, watched television, did puzzles, and talked on the phone. R. 255. She did not participate in social activities because she "like[d] being alone" most of the time. R. 256. Glenda again explained that her health issues impacted her abilities to lift, squat, bend, stand, walk, kneel, climb stairs, and concentrate. *Id.* She estimated that she could lift about twenty-five pounds and walk for ten minutes before needing to rest for fifteen.

10

*Id.* She could not kneel very much, only climbed stairs when she had to, and sometimes got brain fog. *Id.* She used a cane for walking and a bath chair for bathing "only when needed" or when she felt "weak or tired." R. 257.

In April 2019, Glenda testified at a hearing before ALJ Kennedy. *See* R. 71–81. She explained that she could not sit or stand for long periods. R. 72. Standing for too long caused her to experience the "left side weakness and numbness" she had before her back surgery. *Id. But see* R. 73–74 (stating that left sided weakness began after her strokes in 2016). The left sided weakness and numbness usually started in the palm of her hand and then extended "down the side of [her] arm all the way down to [her] foot." R. 73. This occurred "[p]retty much every day" for "[a]bout an hour or two," but Glenda "never kn[e]w when" it would happen. *Id.* When it did, she tried to "move around" to see if she could "get the circulation back" in her arm and leg. *Id.* The left sided numbness did not generally affect her ability to use her hands, "[e]xcept when the left side gets a little numb." R. 74. Glenda noted that although she had previously undergone back surgery, she still had low back arthritis, for which she took 800 milligrams of ibuprofen three times a day. R. 72–73. She also explained that she had high blood pressure that could spike because of "anything," and she worried about passing out or having a stroke while working. R. 72. In terms of her functional abilities, Glenda testified that she lived with her son who did "just about all of [her] housework." R. 77. She could do light dusting and wash "a few dishes" at a time, but she could not stand for long enough to wash a full sink of dishes. *Id.* She could sit for about an hour, walk for about ten minutes, and, although she did not know how long she could stand, she explained that she always used a shopping cart at the store so that she could "shift from side to side" and "have something to prop on" if she got tired of standing. R. 77–78. Glenda also used an unprescribed cane when it rained to prevent falls. R. 78. She estimated that she

could comfortably lift and carry about twenty-five pounds. R. 78–79. Finally, Glenda testified that although she could generally handle her personal care, she required help with bathing. R. 80. She used a bath chair so that she did not have to stand in the shower, and she sometimes needed help to step into the shower without falling. *Id.* She went grocery shopping once a month with her son, but she did not otherwise go out or participate in social activities. *Id.*

    3.    *The ALJ's Decision*

At the beginning of his decision, ALJ Kennedy explained that AR 00-1(4) applies "in this case in view of the final Administrative Law Judge (ALJ) decision made on the claimant's prior application." R. 15. He thus noted that he was required to "consider" findings made "at a step in the sequential [disability] evaluation process" in ALJ Kilbane's prior decision and give them "appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an un-adjudicated period." R. 15–16. ALJ Kennedy further explained:

> The undersigned finds that the record is consistent with the findings of the prior Administrative Law Judge's decision determining that the claimant retained a residual functional capacity for a range of light work on June 28, 2016. However, as will be explained in further detail below, the undersigned finds that the evidence assembled in this case depicts greater limitations than that found in the prior Administrative Law Judge's decision due to new and material evidence and thereby adds limitations [to] the residual functional capacity as set forth herein.

R. 16. Next, ALJ Kennedy determined that Glenda had three severe medically determinable impairments: stroke, hypertension, and COPD. R. 18. He wrote that "all other impairments . . . alleged and found in the record, are non-severe, as they have been responsive to treatment and/or cause no more than minimal work-related limitations." *Id.* At step three, ALJ Kennedy "considered [Glenda's] respiratory impairment under listing 3.02, neurological impairment under listing 11.04, and obesity under SSR 02-1p" to determine whether Glenda had an impairment or

12

combination of impairments that met or equaled a Listing. R. 20. He determined that she did not. *Id.*

Having identified Glenda's severe and non-severe medically determinable impairments, ALJ Kennedy assessed her RFC for the relevant period. *See* R. 20–25. He summarized Glenda's subjective statements about alleged impairments, noting that she testified she could not "tolerate prolonged standing, walking or sitting (walk 10 minutes and sit one hour)"; napped during the day because of fatigue; and alleged "lower back arthritis, status post back surgery," among other impairments. R. 21. He also provided detailed summaries of the medical evidence pertaining to Glenda's hypertension and her November 2016 stroke. *See* R. 21–22. Next, ALJ Kennedy noted that between July 2015 and February 2019, Glenda presented to various medical providers and was diagnosed with multiple health conditions or abnormalities, including:

> right frontal ischemic attack, history of transient ischemic attack, cerebral infarction, hypertension, hyperlipidemia, hypotension, impaired fasting glucose, abdominal distention, COPD, obesity, pedal edema, degenerative disc disease, history of back surgery, arthropathy, neuralgia, neuritis, and nicotine dependence.

R. 22. Briefly addressing her history of back impairments/surgery, ALJ Kennedy stated: "Progress notes further revealed the claimant's complaints of left-sided weakness, slumped gait, history of lumbar hemi-laminectomy with nerve root decompression, upper/lower extremity numbness, lower extremity swelling, and elevated blood pressure. However, progress notes further indicated noncompliance with treatment and medications." *Id.* ALJ Kennedy proceeded to briefly discuss Glenda's various other health conditions and mentioned that "multiple" physical examinations were "unremarkable." *Id.* (citing Exs. B2F to B3F, B10F to B13F).

Turning to the medical opinion evidence and prior administrative findings, ALJ Kennedy summarized ALJ Kilbane's prior RFC finding, Dr. Haubner's medical opinion based on his consultative exam in January 2018, and the DDS consultants' medical opinions based on their

13

review of Glenda's record in September 2017 and January 2018, respectively. R. 23. He found the opinions "generally consistent with each other and the medical evidence of record as a whole given their analysis of clinical findings, examinations, and [Glenda's] reported activities of daily living . . . which support a light exertional level" RFC. *Id.* Because "[n]ot much ha[d] changed since the prior Administrative Law Judge's decision," ALJ Kennedy determined that Glenda was "still capable of work at a light exertional level." R. 23–24. At the same time, he stated that Glenda required additional limitations "due to new and material evidence and recent developments," R. 24, which he did not specifically identify. ALJ Kennedy's RFC finding is more restrictive than ALJ Kilbane's prior finding only insofar as it precludes Glenda's ability to climb ladders/ropes/scaffolds and work near unprotected heights. *Compare* R. 20, *with* R. 93. Otherwise, both RFC findings contain essentially the same exertional, postural, and environmental limitations. R. 20, 93.

Finally, ALJ Kennedy evaluated the credibility of Glenda's symptoms. R. 24–25. He determined that Glenda's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but he concluded that her "statements concerning the intensity, persistence and limiting effects of th[o]se symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. 24. To support this finding, ALJ Kennedy generally explained that Glenda had conservative treatment, unremarkable physical and mental examinations, and activities of daily living that belied her allegations of disability. R. 24–25.

Based on his RFC finding and the VE's hearing testimony, ALJ Kennedy concluded that Glenda could not return to her past relevant work as a CNA during the relevant time, R. 25, but could perform the requirements of certain light, unskilled occupations (price marker, stock checker, ticket seller) that offered a significant number of jobs in the national economy, R. 26;

*see* R. 83–84. Accordingly, he found Glenda "not disabled" from June 20, 2017, the date her application was filed, through the date of his decision. R. 26.

B.   *Analysis*

ALJ Kennedy erred by failing to adequately consider ALJ Kilbane's prior findings as required by AR 00-1(4). To be sure, ALJ Kennedy noted that he was required to comply with AR 00-1(4), R. 15–16, outlined the factors he had to consider in weighing ALJ Kilbane's prior findings, R. 16, and wrote that the record was "consistent" with ALJ Kilbane's findings, but supported additional limitations, *id.*; *see also* R. 23–24. This brief discussion, which primarily recited the applicable standard, was not sufficient to meet the requirements of AR 00-1(4).

AR 00-1(4) instructs ALJs how to proceed when a Virginia resident's case file for "an unadjudicated period" includes "a final decision of [the] SSA after a hearing on a prior disability claim [that] contains a finding required at a step in the sequential evaluation process for determining disability." *See* AR 00-1(4), 2000 WL 43774, at *4 (Jan. 12, 2000) (interpreting *Albright v. Comm'r*, 174 F.3d 473 (4th Cir. 1999); *Lively v. Sec'y of Health & Human Servs.*, 820 F.2d 1391 (4th Cir. 1987)). The Ruling applies to "a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process for determining disability," such as the nature or severity of the claimant's medical impairment, that "was made in a final decision by an ALJ or the Appeals Council on a prior disability claim." *Id.* (citing 20 C.F.R. § 416.920); *see Taylor v. Colvin*, No. 3:12cv8626, 2013 WL 6243716, at *13–14 (S.D. W. Va. Dec. 3, 2013) (explaining that AR 00-1(4) is a "very limited" exception to the SSA's general rule that it "does not consider findings made during the determination of a disability claim [as] . . . evidence relevant to the determination of a later-filed claim"). If those criteria are met, then the ALJ "must consider such a prior finding as evidence and give it

15

appropriate weight in light of all relevant facts and circumstances" in the claimant's subsequent case. AR 00-1(4), 2000 WL 43774, at *4. Specifically, the ALJ must consider "such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim." *Id.* Prior administrative findings about facts that are subject to change over time, such as the claimant's RFC or "that a claimant does or does not have an impairment(s) which is severe," typically deserve "greater" weight "when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim" and deserve "less weight" as the prior period "becomes more remote." *Id.*; *see also Lively*, 820 F.2d at 1391 (explaining that it was "utterly inconceivable" that the plaintiff "so improved in two weeks" as to be able to perform medium work (as the new ALJ found) instead of light work (as the prior ALJ had found), particularly where there was "no evidence of any such miraculous improvement").

  Here, Glenda correctly argues that ALJ Kennedy failed to consider how much weight to give to ALJ Kilbane's prior step two finding that she had a "severe" impairment of degenerative disc disease. While ALJ Kennedy was not required to *adopt* ALJ Kilbane's prior step two findings, he was required to assess them under the factors outlined in AR 00-1(4). *See* AR 00-1(4), 2000 WL 43774, at *4. Had he done so, it is possible that ALJ Kennedy might have reasonably determined that Glenda no longer had a severe impairment of degenerative disc disease and explained why. But instead, ALJ Kennedy made no mention whatsoever of

16

degenerative disc disease or any other back/spine-related impairments at step two. *See* R. 18–19. He merely discussed stroke, hypertension, COPD, anxiety, obsessive-compulsive disorder, and depression. *Id.* He did also find "that all other impairments other than [stroke, hypertension, and COPD], alleged and found in the record, are non-severe, as they have been responsive to treatment and/or cause no more than minimal work-related limitations," R. 18, but this statement is purely boilerplate and does not show that ALJ Kennedy actually considered whether Glenda still had a severe impairment of degenerative disc disease under the factors articulated in AR 00-1(4). *See* AR 00-1(4), 2000 WL 43774, at *4. Indeed, ALJ Kennedy did not even determine whether Glenda had a medically determinable impairment (severe or non-severe) of degenerative disc disease. R. 18.

The Commissioner contends that even if ALJ Kennedy failed to properly consider ALJ Kilbane's prior findings, that error was harmless. Def.'s Br. 10 n.1, ECF No. 20. She argues that because ALJ Kennedy identified other severe impairments at step two, he considered the effects of all her impairments at the subsequent steps of his analysis. *Id.* I disagree. An ALJ's erroneous failure to identify a particular severe impairment at step two can be harmless if the ALJ adequately addresses that impairment and any related functional limitations at the subsequent steps of his analysis. *Rivera v. Astrue*, No. CBD 12-1095, 2013 WL 4507081, at *7 (D. Md. Aug. 22, 2013); *see also Ramon M. v. Berryhill*, No. CBD-18-2025, 2019 WL 2436938, at *5–8 (D. Md. June 10, 2019). But here, ALJ Kennedy's failure to consider whether Glenda had a severe impairment of degenerative disc disease at step two "infect[ed] the entire decision." *Fountain v. Astrue*, No. CBD 11-1884, 2013 WL 145873, at *4 (D. Md. Jan. 11, 2013). ALJ Kennedy acknowledged that Glenda complained of "lower back osteoarthritis, status post back surgery," R. 21, but he did not assess whether her back impairments met or equaled Listing 1.01 or 1.04 at

17

step three, *see* R. 20. He also failed to adequately consider any effect of her back impairments in the RFC assessment, mentioning her history of lumbar issues in a single sentence and merely noting that physician notes suggested noncompliance with treatment recommendations. R. 22; *see also* R. 20–25. And because ALJ Kennedy did not even find Glenda's degenerative disc disease to be a non-severe medically determinable impairment, it is not clear that he considered her degenerative disc disease or any other back impairments when assessing the credibility of Glenda's allegations that she could not sit, stand, or walk very long because of back pain. R. 21, 24–25; *cf. Woody N. v. Berryhill*, No. 4:17cv44, 2018 WL 10806836, at *5 (W.D. Va. Aug. 22, 2018) (ALJ's unsupported finding that claimant "did not have a torn labrum in his right hip" was not harmless error because, having made that finding at step two, "there was no reason for [the ALJ] to consider that abnormality as an independent source of [claimant's] musculoskeletal pain when weighing the subjective evidence of his pain-related limitations" on sitting, standing, and walking).

Accordingly, I cannot find that ALJ Kennedy's decision is supported by substantial evidence. *See, e.g.*, *Tamika B. v. Saul*, No. GLS 19-3345, 2021 WL 949469, at * (D. Md. Mar. 12, 2021) (remanding where ALJ did not find particular severe impairments at step two, failed to explain why she did not find them to be medically determinable impairments, "whether severe or not severe," and failed to discuss them at any of the subsequent steps of the analysis); *Beatty v. Berryhill*, No. 7:15cv223, 2017 WL 632095, at *2–3 (E.D.N.C. Feb. 9, 2017) (finding ALJ's determination that claimant's diabetes was not severe at step two was not harmless where the ALJ failed to consider his diabetes "and any resulting neuropathy at subsequent steps in the disability determination"); *Dominique v. Colvin*, No. 7:13cv19, 2014 WL 888403, at *2 (E.D.N.C. Mar. 6, 2014) (remanding where ALJ failed to consider evidence of claimant's obesity

18

at step two and then failed to "expressly consider" obesity at subsequent steps in the analysis).

## IV. Conclusion

I take no position on whether Glenda is entitled to disability benefits for the relevant period. But because ALJ Kennedy failed to comply with the requirements of AR 00-1(4), I am unable to find that his decision to deny benefits is supported by substantial evidence. On remand, the ALJ must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Glenda cannot prove she was disabled based on the medical evidence alone, provide a logical link between the evidence the ALJ found credible and the RFC determination.

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Glenda's Motion for Summary Judgment, ECF No. 18, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 19, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: December 13, 2021

Joel C. Hoppe
United States Magistrate Judge